UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK BAKER,

                    Petitioner,

        -against-

LEE JOHNSON, as Secretary of
the U.S. Department of Homeland
Security; CHRISTOPHER SHANAHAN,
as New York Field Officer
Director for Immigration and
Customs Enforcement; ERIC H.
HOLDER, JR., as Attorney
General of the United States;
JUAN P. OSUNA, as Director of
the Executive Office for
Immigration Review; THOMAS
MULLIGAN, as Immigration Judge,
Department of Justice; and
OSCAR AVILES, as Director,
Hudson County Department of
Corrections,

                    Respondents.

**OPINION & ORDER**

14 Civ. 9500 (LAP)



LORETTA A. PRESKA, CHIEF U.S.D.J.:

     On June 5, 2014, Petitioner Patrick Baker was taken into

custody by U.S. Immigration and Customs Enforcement ("ICE"), an

agency within the U.S. Department of Homeland Security ("DHS").

Petitioner is currently detained at the Hudson County

Correctional Center in Kearny, New Jersey and is facing removal

proceedings based on his prior criminal convictions.  Petitioner

was detained by ICE pursuant to the Immigration and Nationality

Act ("INA") § 236(c), 8 U.S.C. § 1226(c), the mandatory

detention statute that requires the Attorney General to detain certain classes of criminal aliens "when the alien is released" from criminal custody.  8 U.S.C. § 1226(c)(1).  Petitioner's request for a bond hearing pending the removal proceedings was denied.

On December 2, 2014, Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241.  Petitioner presents two arguments against the application of the mandatory detention statute in this case.  First, he argues that, under the plain language of the statute, Section 1226(c) only applies where an alien is taken into ICE custody immediately upon the alien's release from non-ICE custody.  Given the four-and-a-half-year gap between his release from criminal custody and when ICE detained him, Petitioner argues that he is not subject to mandatory detention because he was not taken into ICE custody under the meaning of the phrase "when . . . released."  8 U.S.C. 1226(c)(1).  Second, Petitioner argues that his mandatory detention violates the Due Process Clause of the Fifth Amendment.  Accordingly, Petitioner claims that he is entitled to an individualized bond hearing under INA § 236(a), 8 U.S.C. § 1226(a).

I.   BACKGROUND

Petitioner is a citizen and native of Jamaica.  (Pet. Br. (Dkt. No. 9) Ex. 1 ("Notice to Appear").)  On June 18, 1989,

2

Petitioner entered the United States as a lawful permanent resident. (Id.) At the time of his detention, Petitioner and his girlfriend, Chavonda Wilkins – a United States citizen – were living in a homeless shelter in the Bronx, New York, with their son Patrick and Ms. Wilkins's daughter, Angelique. (Id.; see id. Ex. 2 ("Wilkins Affidavit") ¶¶ 1, 2, 4, 7.) Five days after Petitioner was detained, Ms. Wilkins gave birth to their second son, Alton. (Id. ¶ 9.) Before he was detained by ICE, Petitioner was employed at a packing facility in Brooklyn, New York for approximately three years. (Id. ¶¶ 3, 5.)

In the twenty-five years that Petitioner has lived in the United States, he has been arrested six times. (Id. Ex. 3 ("Certificate of Disposition").) Most recently, Petitioner was arrested on December 14, 2009 for failure to pay the subway fare in violation of New York Penal Law § 165.15. (Id. at 6) Petitioner pled guilty to the charge on December 15, 2009, agreed to perform three days of community service, and was released from custody. (Id.)

On June 5, 2014 – approximately four and a half years after he was released from custody – Petitioner was detained by ICE agents outside of the homeless shelter that he was living in with his family. (Id.; Wilkins Affidavit ¶ 8.) Petitioner was transferred to the Hudson County Correctional Center in Kearny, New Jersey. (Id. Ex. 4 ("ICE Detainee Locator System").) On

June 5, 2014, ICE initiated removal proceedings against
Petitioner by serving him with a Notice to Appear, charging that
Petitioner is removable from the United States pursuant to INA
§§ 237(a)(2)(A)(i)-(iii), for having been convicted of two or
more crimes involving moral turpitude and for having been
convicted of an aggravated felony. (Notice to Appear.)  The
Notice to Appear specified that Petitioner was subject to
removal for (1) a 1994 conviction for attempted robbery in the
second degree; (2) a 1995 conviction for sexual misconduct; and
(3) a 2005 conviction for menacing in the second degree.  (Id.)
On August 6, 2014, the Immigration Judge ("IJ") sustained the
charge of removability for the two crimes involving moral
turpitude, pursuant to INA § 237(a)(2)(A)(ii), but declined to
find that Petitioner had been convicted of an aggravated felony.
(See id. Ex. 5 ("IJ Order"); Resp. Br. (Dkt. No. 11) at 3.)

On December 2, 2014, Petitioner appeared before IJ Thomas
Mulligan to (1) challenge ICE's determination that he was
subject to mandatory detention under 8 U.S.C. § 1226(c); and (2)
request that the IJ allow him to be released upon the posting of
a bond.  (IJ Order; see also Resp. Br. at 3.)  On February 12,
2015, Judge Mulligan determined that Petitioner's two
convictions for crimes involving moral turpitude subjected him

to mandatory detention, and he denied Petitioner's request for a change in custody status.  (See IJ Order.)[1]

On December 2, 2014 – while he was temporarily detained in the Southern District of New York – Petitioner filed this habeas petition.[2]  On March 9, 2015, the Government filed an opposition brief (Dkt. No. 11), and Petitioner filed a reply brief on March 20, 2015 (Dkt. No. 12).

II.  DISCUSSION

"To obtain habeas relief pursuant to 28 U.S.C. § 2241, a petitioner must demonstrate that he is being detained 'in violation of the Constitution or laws or treaties of the United States.'"  Araujo-Cortes v. Shanahan, No. 14 Civ. 4231, 35 F. Supp. 3d 533, 539 (S.D.N.Y. 2014) (quoting 28 U.S.C. § 2241(c)(3)).  Petitioner argues that he is not subject to mandatory detention because:  (1) 8 U.S.C. § 1226(c) does not apply because he was not detained by ICE immediately after he was released from criminal custody; and (2) his detention without a bond hearing violates due process, given the four-and-a-half-year time lapse between his release from criminal custody

---

[1] On February 12, 2015, the Immigration Court also held a hearing on the merits of Petitioner's application for relief.  (Kling Aff. (Dkt. No. 12) ¶ 2.)  The Immigration Judge ("IJ"), however, has not yet made a decision on the merits of Petitioner's application and is awaiting further documentation from criminal court in order to issue a ruling.  (Id. ¶¶ 3-4.)  Petitioner was scheduled to appear before the Immigration Court on April 21, 2015.  (Id. ¶ 5.)

[2] The Government does not object to this Court's jurisdiction over the habeas petition.  (See Resp. Br. at 3 n.4.)

and when he was detained by ICE, as well as the fact the length
of his present detention.

    A.   MANDATORY DETENTION UNDER INA SECTION 236(c)

    Section 236 of the INA, codified at 8 U.S.C. § 1226,
governs the apprehension and detention of aliens.  "When an
alien is arrested and detained pending a decision on removal,
DHS generally has the discretion to release him on bond."  Young
v. Aviles, No. 14 Civ. 9531, 2015 WL 1402311, at *2 (S.D.N.Y.
Mar. 26, 2015) (citing 8 U.S.C. § 1226(a)).  "Section 1226(c),
entitled 'Detention of criminal aliens,' however, provides for
mandatory detention for certain criminal aliens."  Reynoso v.
Aviles, No. 14 Civ. 9482, 2015 WL 500182, at *3 (S.D.N.Y. Feb.
5, 2015).  8 U.S.C. § 1226 provides, in relevant part:

> The Attorney General shall take into custody any alien
> who –
>
> (A)  is inadmissible by reason of having committed any
>      offense covered in section 1182(a)(2) of this title,
>
> (B)  is deportable by reason of having committed any
>      offense covered in section 1227(a)(2)(A)(ii),
>      (A)(iii), (B), (C), or (D) of this title,
>
> (C)  is deportable under section 1227(a)(2)(A)(i) of
>      this title on the basis of an offense for which the
>      alien has been sentence[d] to a term of imprisonment
>      of at least 1 year, or
>
> (D)  is inadmissible under section 1182(a)(3)(B) of
>      this title or deportable under section 1227(a)(4)(B)
>      of this title,
>
> when the alien is released, without regard to whether
> the alien is released on parole, supervised release,
> or probation, and without regard to whether the alien

may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (emphasis added).[3]  Pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii) – the relevant provision here – "[a]ny alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable."  8 U.S.C. § 1227(a)(2)(A)(ii). Under 8 U.S.C. § 1226(c)(2), "[t]he Attorney General may release an alien described in paragraph (1) [of 1226(c)]" in certain circumstances that are not relevant here.  8 U.S.C. § 1226(c)(2).

Here, Petitioner does not dispute that he qualifies for removal under the crimes enumerated in § 1227(a)(2)(A)(ii). Instead, Petitioner argues that the language in Section 1226(c)(1) requiring that DHS take certain aliens into custody "when . . . released" means that an alien must be taken into ICE

---

[3] "Congress enacted this provision pursuant to section 303(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") . . . ."  Louisaire v. Muller, 758 F. Supp. 2d 229, 235 (S.D.N.Y. 2010).  "Congress deferred the rule's implementation for two years, directing that the new INA § 236(c) provisions 'shall apply to individuals released after such periods.'"  Id. (quoting IIRIRA § 303(b)(2)).  In the intervening two years, the Transition Period Custody Rules ("TPCR"), enacted by section 303(b)(3) of the IIRIRA, were in force.  See In re Adeniji, 22 I. & N. Dec. 1102, 1107 (BIA 1999).  "The TPCR expired on October 8, 1998, and the mandatory detention provision of section 236(c) of the Act became effective."  Matter of Garcia Arreola, 25 I. & N. Dec. 267, 268 n.2 (BIA 2010).

custody immediately after the alien is released from criminal custody.  (See Pet. Br. at 4.)  Because Petitioner was not detained until June 2, 2014 – nearly five years after his last arrest and nine years after the underlying conviction for which Petitioner is facing removal proceedings – he argues that he is not subject to mandatory detention.  (See id.)  By contrast, the Government argues that Section 1226(c) applies even though Petitioner was not immediately detained upon his release from criminal custody.  (See Resp. Br. at 9-13.)

As an initial matter, courts in this district are split on whether aliens, such as Petitioner, who are not detained immediately upon their release from criminal custody are subject to mandatory detention under Section 1226(c).  Indeed, judges in this district who have tackled the meaning of the phrase "when released" have divided into two schools of interpretation:  the "duty-triggering" construction and the "time-limiting" construction.  Straker v. Jones, 986 F. Supp. 2d 345, 352-53 (S.D.N.Y. 2013) (collecting cases).  Under the duty-triggering construction, "the 'when released' clause does not place an expiration date on DHS's duty under § 1226(c); if an alien who meets the requirements of § 1226(c) is released from criminal custody and DHS does not immediately take him into immigration custody, DHS continues to have the duty, and therefore the authority, to take that alien into custody."  Id.  In other

8

words, the "when released" clause "creates a pre-condition for
DHS to exercise its mandatory detention authority, but does not
set a temporal deadline for its use." Reynoso, 2015 WL 500182,
at *4.  Under the time-limiting interpretation, however, "DHS
can subject an alien to mandatory detention only if it detains
him at, or around, the time he is released from criminal custody
for the removable offense." Straker, 986 F. Supp. 2d at 352.

Although the Third and Fourth Circuits have adopted the
"duty-triggering" construction, the Second Circuit and the
Supreme Court have not yet addressed this issue. See Hosh v.
Lucero, 680 F.3d 375 (4th Cir. 2012); Sylvain v. Attorney Gen.
of U.S., 714 F.3d 150 (3d Cir. 2013).  However, the Board of
Immigration Appeals ("BIA") – "the highest immigration body
charged with interpreting and implementing immigration laws,"
Reynoso, 2015 WL 500182, at *4 – has also adopted the "duty-
triggering" construction. See In re Rojas, 23 I. & N. Dec. 117
(BIA 2001).  With this background in mind, the Court considers
the appropriate interpretation of Section 1226(c).

1.    Statutory Interpretation

"Statutory analysis begins with the text and its plain
meaning, if it has one." Gottlieb v. Carnival Corp., 436 F.3d
335, 337 (2d Cir. 2006).  "When a statute's language is clear,
[a court's] only role is to enforce that language according to
its terms." Life Receivables Trust v. Syndicate 102 at Lloyd's

of London, 549 F.3d 210, 216 (2d Cir. 2008) (quoting Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 236 (2d Cir. 2006)) (internal quotation marks omitted).  A court must "interpret a statute as it is, not as it might be, since 'courts must presume that a legislature says in a statute what it means and means in a statute what it says . . . .'"  Id. (alteration in original) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).

        "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  The Supreme Court has made clear that "deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."  Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48 (1987)).  If a court "conclude[s], after employing standard tools of statutory interpretation, that Congress has 'unambiguously expressed' its meaning, that meaning controls."  Riverkeeper, Inc. v. EPA, 358 F.3d 174, 184 (2d Cir. 2004) (quoting Chevron, 467 U.S. at 843).  "'[I]f,' on the other hand, 'the statute is silent or ambiguous with respect to the specific issue, the

question for the court is whether the agency's answer is based on a permissible construction of the statute,' which is to say, one that is 'reasonable,' not 'arbitrary, capricious, or manifestly contrary to the statute.'" Id. (alteration in original) (quoting Chevron, 467 U.S. at 843-44).

     2.   The Plain Language of the Statute is Ambiguous

Petitioner argues that under the plain language of the statute, the phrase "when . . . released" requires that "detention occur immediately after release from non-DHS custody." (Pet. Br. at 10-11; see also id. at 9-11 (citing cases).) In his reply brief, Petitioner further argues that, had Congress intended for mandatory detention to apply to aliens at any time after they were released, (1) Congress would have used the word "after" instead of "when"; and (2) the phrase "when . . . released" would be superfluous. (See Pet. Reply at 3-4.) In the alternative, Petitioner argues that, even if the term is ambiguous, the Government's interpretation is unreasonable.

As illustrated by the diverging opinions in this district concerning the meaning of the word "when," this Court cannot conclude that the phrase "when . . . released" is unambiguous. For example, "[a]s several courts have explained, '[t]he term "when" includes the characteristic of "immediacy," referring in its primary conjunctive sense, to action or activity occurring

11

"at the time that" or "as soon as" other action has ceased or begun.'" Lora v. Shanahan, 15 F. Supp. 3d 478 (S.D.N.Y. 2014) (quoting Scarlett v. U.S. Dep't of Homeland Sec. Bureau of Immigration & Customs Enforcement, 632 F. Supp. 2d 214, 219 (W.D.N.Y. 2009)).  "[I]t is also a 'reasonable ordinary usage' for the word 'when' to refer to a duty that, although arising 'at the time that,' continues forward.  For example, if a person lends a book to a friend and asks her to 'return the book when you finish reading it,' the borrowing friend's duty to return the book arises once she finishes reading the book.  It does not evaporate if she fails to promptly return it."  Straker, 986 F. Supp. 2d at 354.  As an initial matter, therefore, the plain language of the statute is far from clear.

This Court is unpersuaded by Petitioner's arguments to the contrary.  In Lora v. Shanahan, cited by Petitioner, the court found that, "if Congress had intended for mandatory detention to apply to aliens at any time after they were released, it easily could have used the language 'after the alien is released,' 'regardless of when the alien is released,' or other words to that effect."  15 F. Supp. 3d at 488 (emphasis in original) (quoting Quezada-Bucio v. Ridge, 317 F. Supp. 2d 1221, 1230 (W.D. Wash. 2004)) (internal quotation marks omitted).  Yet Congress also could have easily used the word "immediately" in the statute or otherwise "expressly put a time limit on DHS's

mandatory detention authority." Straker, 986 F. Supp. 2d at
353. Indeed, "[t]here were ready ways for Congress to set an
outside deadline on agency action: Had Congress so intended, it
could have given DHS a timetable to effect a mandatory detention
after the alien's release. Congress did not do so." Id.
Although Petitioner contends that the word "when" itself places
a temporal limit in Section 1226(c), the word "when" is "also
unhelpfully imprecise as to what that time limit is[.]" Id. In
other words, although "Congress could certainly have used
clearer language to convey" the intent that release from
criminal custody was only a precondition for ICE detention, "it
could also have used clearer language if its intent was to"
provide a time limit for the Attorney General's authority.
Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 120 (2d Cir.
2007). "Faced with competing, plausible interpretations," this
Court concludes "that the statutory text is ambiguous in
conveying Congress's intent." Id.

     Petitioner next argues that the Government's interpretation
of "when . . . released" would violate the rule against
surplusage. In so doing, Petitioner relies on the distinction
between 8 U.S.C. § 1226(c) and 8 U.S.C. § 1226a(a) – which
relates to the detention of suspected terrorist aliens and,
notably, does not include the phrase "when . . . released."
Section 1226a(a) provides, in relevant part, that "[t]he

Attorney General shall take into custody any alien who is certified under paragraph (3)." 8 U.S.C. § 1226a(a)(1). It is true that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Nken v. Holder, 556 U.S. 418, 430-31 (2009) (quoting, 480 U.S. at 432) (internal quotation marks omitted). The flaw in Petitioner's argument, however, is that it assumes that the phrase "when . . . released" only has one meaning – namely, that it specifies the exact time that ICE has the authority to detain a certain class of aliens.

Petitioner ignores the possibility that the phrase may also serve as a condition precedent: an alien qualifying for removal pursuant to Section 1226(c) must first be released from criminal custody before ICE has authority to detain him. No similar requirement exists for alien terrorists. See Straker, 986 F. Supp. 2d at 355 ("[t]he word 'released' is itself a word of limitation," and the phrase "when . . . released" may also connote a condition that must occur before the Attorney General's authority ripens); see also Young, 2015 WL 1402311, at *4 (the "when released" clause also "makes plain that DHS's duty and authority to detain a criminal alien ripens only upon release from criminal custody – and not before" (emphasis in

original)).  Accordingly, the Government's interpretation does not render the phrase "when . . . released" superfluous.

Finally, Petitioner contends that, even if the term is ambiguous, the Government's interpretation is unreasonable because Petitioner was not detained by ICE "around or during th[e] time" that he was released from criminal custody.  (Pet. Reply at 4.)  To the extent Petitioner concedes that the term is ambiguous, however, it is not this Court's role to engage in ad hoc line-drawing.  See Reynoso, 2015 WL 500182, at *5 (refusing to impute a "reasonable time" limitation into the statute because: "The Court's role is to interpret a statute.  It is not to rewrite it.").  Instead, because this Court determines that, at best, the meaning of the phrase "when . . . released" is ambiguous, under Chevron, this Court turns to the BIA's interpretation of the statute.  See Chevron, 467 U.S. at 843-44.

3.   Agency's Interpretation

In Rojas, the non-citizen respondent argued that he was not subject to mandatory detention under Section 1226(c) because immigration authorities did not take him into custody until two days after his release.  Like Petitioner here, respondent argued that he was not detained "'when . . . released' from incarceration, but rather was free in the community before being detained by [immigration]."  Rojas, 23 I. & N. Dec. at 118.

In determining whether respondent was subject to mandatory detention, the BIA explained that "[t]he mandatory detention aspects of the statute . . . derive from the language of [Section 1226(c)(2),]" which "specifies that the Attorney General may release 'an alien described in paragraph (1)' only if certain strict conditions are met." Id. at 119.  Thus, the issue presented was "whether the respondent [was] 'an alien described in paragraph (1)' of [Section 1226(c)], even though he was not immediately taken into custody by [immigration] when he was released from his criminal custody." Id.  To resolve that issue, the BIA explained that it "must determine whether an 'alien described in paragraph (1)' is a statutory reference to any alien who falls simply within the discrete language of [Section 1226(c)(1)(A)-(D)], or whether it additionally refers to an alien who is taken into [immigration] custody 'when the alien is released.'" Id.  In other words, the BIA was required to "determine whether or not the phrase 'when the alien is released' is a necessary part of the description of the alien in paragraph (1)." Id.

In addressing this question, the BIA found that the language of 'an alien described in paragraph (1),' "when read in isolation, [is] susceptible to different readings." Id. at 20. Specifically, the BIA found that the literal language "does not unambiguously [indicate] whether it encompasses the 'when the

16

alien is released' clause in [Section 1226(c)(1)] or merely

references the four categories of aliens described in

subparagraphs (A) through (D)." Id. Nonetheless, the BIA

determined that

> [t]he statutory reference to "an alien described in
> paragraph (1)" seems to us most appropriately to be a
> reference to an alien described by one of four
> subparagraphs, (A) through (D). The "description" of
> the alien does not naturally appear to include any or
> all of the concluding clauses of paragraph (1), namely
> the clauses directing that a described alien be taken
> into custody "when the alien is released, without
> regard to whether the alien is released on parole,
> supervised release, or probation, and without regard
> to whether the alien may be arrested or imprisoned
> again for the same offense."

Id. at 121. To that end, the BIA concluded that "the duty to

detain is not affected by the character of an alien's release

from criminal incarceration . . . ." Id. In relevant part, the

BIA held "that the respondent is subject to mandatory detention

pursuant to section [1226(c)] of the Act, despite the fact that

he was not taken into [immigration] custody immediately upon his

release from state custody." Id. at 127.

    This Court cannot conclude that the BIA's interpretation is

"arbitrary, capricious, or manifestly contrary to the statute."

Chevron, 467 U.S. at 844. Applying Chevron, therefore,

Petitioner is subject to mandatory detention under Section

1226(c), despite the approximate five-year lapse in time between

his release from criminal custody and ICE detention.

17

4.   Legislative Purpose of Section 1226(c)

In <u>Demore v. Kim</u>, 538 U.S. 510 (2003), the Supreme Court made findings regarding the statute's legislative history:

> Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens.  Criminal aliens were the fastest growing segment of the federal prison population, already constituting roughly 25% of all federal prisoners, and they formed a rapidly rising share of state prison populations as well.  Congress' investigations showed, however, that the INS could not even <u>identify</u> most deportable aliens, much less locate them and remove them from the country.  One study showed that, at the then-current rate of deportation, it would take 23 years to remove every criminal alien already subject to deportation.  Making matters worse, criminal aliens who were deported swiftly reentered the country illegally in great numbers. . . .
>
> Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings. The Attorney General at the time had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings when those aliens were determined not to present an excessive flight risk or threat to society. Despite this discretion to conduct bond hearings, however, in practice the INS faced severe limitations on funding and detention space, which considerations affected its release determinations.
>
> Once released, more than 20% of deportable criminal aliens failed to appear for their removal hearings. . . .  Congress [therefore] enacted 8 U.S.C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability.

<u>Demore</u>, 538 U.S. at 518-21 (emphasis in original) (citations omitted).  The BIA's interpretation of the statute accords with the overall statutory purpose of Section 1226(c).  <u>See</u> <u>Rojas</u>, 23

I. & N.  Dec. at 121-22.  Indeed, "[h[olding that mandatory detention applies even where detention is delayed furthers that purpose; holding otherwise would not." Young, 2015 WL 1402311, at *5 (citations omitted).

Petitioner nevertheless argues that in enacting Section 1226(c), Congress intended to target a specific group of aliens "who were recently released from criminal custody and were presumptively considered risks of flight and recidivism."  (Pet. Reply at 4.)  In this way, Petitioner claims that "[t]he purpose of the statute is not being served when someone who has been peaceably living in the community for many years is suddenly detained."  (Id. at 4-5.)

The BIA addressed this question, however, finding that "[t]he statute does direct the Attorney General to take custody of aliens immediately upon their release from criminal confinement.  But Congress was not simply concerned with detaining and removing aliens coming directly out of criminal custody; it was concerned with detaining and removing all criminal aliens." Rojas, 23 I. & N.  Dec. at 122 (emphasis in original).  Accordingly, the BIA determined that "the statute as a whole is focused on the removal of criminal aliens in general, not just those coming into [Immigration] custody 'when . . . released' from criminal incarceration." Id.

19

Petitioner also contends that "[t]he enactment of the TPCR would not have been necessary if § 1226(c) allowed the government to subject someone to mandatory detention at any time after release." (Pet. Reply at 5.) Instead, "Congress could have foregone enacting the TPCR entirely and allowed the government to implement § 1226(c) on a rolling basis as resources allowed." (Id. (citation omitted).) Although this argument is appealing, this Court ultimately finds it unpersuasive.

In enacting Section 1226(c), Congress intended to eliminate discretion from the Attorney General to conduct bond hearings for certain criminal aliens and to take an aggressive approach in detaining that particular group. See Hosh, 680 F.3d at 380. It would therefore be peculiar if Congress mandated the detention of one alien and allowed a bond hearing for another who committed the same crime, simply because the latter "was not immediately detained after release due to an administrative oversight or any other reason . . . ." Id.; see also Rojas, 23 I. & N. Dec. at 124. As the BIA recognized, it would be "inconsistent with our understanding of the statutory design to construe section [1226(c)] of the Act in a way that permits the release of some criminal aliens, yet mandates the detention of others convicted of the same crimes, based on whether there is a delay between their release from criminal custody and their

apprehension by [ICE]." Rojas, 23 I. & N. Dec. at 124.

Indeed, "'[n]othing in the text, legislative history, or

structure of this statute suggests that Congress intended to

treat criminal aliens differently depending on whether they were

detained immediately upon release from custody . . . .'" Romero

v. Shanahan, No. 14 Civ. 6631, 2014 WL 6982937, at *5 (S.D.N.Y.

Dec. 10, 2014) (quoting Mendoza v. Muller, No. 11 Civ. 7857,

2012 WL 252188, at *3 (S.D.N.Y. Jan. 25, 2012)).  Furthermore,

to permit such differential treatment would "reintroduce[ ]

discretion into the process and bestow a windfall upon dangerous

criminals." Sylvain, 714 F.3d at 161.  If the Attorney General

does not immediately detain an alien upon release from criminal

custody, she would create for herself the discretion to conduct

a bond hearing.  As such, Petitioner's interpretation would

controvert the statutory design and legislative purpose of

Section 1226(c).

    Moreover, there were practical reasons for delaying the

enactment of Section 1226(c).  If 1226(c) had been enacted

immediately, the agency may have found itself overwhelmed and

unable to comply with the mandatory statute.  In fact, between

the time that Petitioner was released from criminal custody and

detained by ICE, the agency was not in compliance with the

statute.  In providing a two-year delay, Congress allowed the

agency to prepare for the mandatory rule by, for example,

finding more detention space or hiring more personnel.[4]
Moreover, this Court considers it a stretch of the imagination
to assume that a two-year administrative grace period
necessarily implies that Congress intended for the Attorney
General to be able to detain any and every criminal alien upon
release from criminal custody.  "To be sure, immigration
officials should act without delay. . . . But government
officials are neither omniscient nor omnipotent[, and] it is
inevitable that, despite the most diligent efforts of the
Government and the courts, some errors in the application of the
time requirements . . . will occur."  Id. at 159 (quoting United
States v. Montalvo-Murillo, 495 U.S. 711, 720 (1990)) (internal
quotation mark omitted).

Finally, Petitioner's statutory interpretation would bestow
a windfall to those aliens who, by luck, were not immediately
detained upon their release from criminal custody.  Petitioner
argues that "the Government [would] still ha[ve] the authority
under § 1226(a) to take criminal aliens into custody, and to
assert at a bond hearing that the alien is a danger to the

---

[4]  Indeed, as one court in this district noted, "[a]nticipating that the INS
may not have enough detention space and personnel to enforce § 1226(c)
immediately, Congress provided the Attorney General with the option of
invoking a set of transition period custody rules . . . that would give her a
grace period, during which mandatory detention of criminal aliens would not
be the general rule."  Ahmed v. McElroy, No. 97 Civ. 1121, 1997 WL 414119, at
*2 (S.D.N.Y. July 24, 1997).

community or a flight risk." (Pet. Reply at 7.) In other words, authorizing a bond hearing would not necessarily require that Petitioner be released and would offer no windfall. Contrary to Petitioner's assertion, however, the windfall is an alien's eligibility "for a hearing – which could lead to his release – merely because an official missed the deadline." Sylvain, 714 F.3d at 161. Accordingly, the legislative purpose of Section 1226(c) does not disturb the Court's conclusions that the BIA's interpretation is reasonable and that Petitioner is subject to mandatory detention under the statute.

     B.   DUE PROCESS CLAUSE

Under the Fifth Amendment of the Constitution, "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law . . . ." U.S. Const. amend. V. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306 (1993). "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). "Further, it is plain that '[i]ndefinite detention in connection with removal proceedings without an opportunity for a bail hearing, where there is no possibility of actual removal, violates the due process rights of the detained alien.'" Young,

23

2015 WL 1402311, at *7 (alteration in original) (quoting Debel
v. Dubois, No. 13 Civ. 6028, 2014 WL 1689042, at *5 (S.D.N.Y.
Apr. 24, 2014)); see also Zadvydas, 533 U.S. at 690 ("A statute
permitting indefinite detention of an alien would raise a
serious constitutional problem.").  The Supreme Court has,
however, "recognized detention during deportation proceedings as
a constitutionally valid aspect of the deportation process."
Demore, 538 U.S. at 523.

    "In Demore v. Kim, the Supreme Court rejected a facial
challenge to the constitutionality of § 1226(c) and held that
mandatory detention during the 'brief period necessary
for . . . removal proceedings,' is constitutional as 'part of
the means necessary to give effect' to removal provisions in the
INA." Romero, 2014 WL 6982937, at *6 (alteration in original)
(quoting Demore, 538 U.S. at 513, 523, 531).  In Demore the
petitioner also argued that Section 1226(c) was unconstitutional
as applied to him because he had been detained for six months.
The Court similarly rejected this argument, finding that,
"[u]nder § 1226(c), not only does detention have a definite
termination point, in the majority of cases it lasts for less
than the 90 days" which is presumptively valid.  Demore, 538
U.S. at 529.  Although petitioner was detained for longer than
the majority of cases, the Court found that six months was a

permissibly limited period of detention under the statute.  See
id. at 531.

Here, Petitioner argues that his mandatory detention
violates the Due Process Clause because (1) there was an
approximate five-year time gap between his release from criminal
custody and his ICE detention; and (2) he has been held in ICE
detention since June 5, 2014 – or approximately eleven months.

    1.   Delay between Criminal Release and ICE Detention

Petitioner argues that Section 1226(c) is unconstitutional
as applied to him because in Demore, the Supreme Court "did not
address whether it violates due process where there has been a
significant delay in pursuing or completing deportation
proceedings." (Pet. Reply at 7-8)  In fact, Petitioner argues
that the Court left open the possibility to challenge mandatory
detention based on a delay.  See Demore, 538 U.S. at 532
(Kennedy, J., concurring) ("[An] alien . . . could be entitled
to an individualized [bond hearing] if the continued detention
became unreasonable or unjustified.").  In Demore, however, the
Court addressed whether the total length of detention time
violated the Due Process Clause, and Justice Kennedy's
concurrence merely suggested that an unreasonably long detention
period could be subject to challenge on that theory.  See id.
He did not indicate that a delay between an alien's release from
criminal custody and ICE detention was also susceptible to a due

25

process challenge.   Accordingly, Petitioner's reliance on
Justice Kennedy's concurrence is misplaced.

Petitioner also relies on Zadvydas to argue that "mandatory
detention at this time, after his life circumstances have
changed, no longer bears a reasonable relationship to the
asserted purpose of the statute." (Pet. Reply at 8.)   In
Zadvydas, the Court held that, pursuant to 8 U.S.C. § 1231 –
which governs an alien's detention following an order of removal
– continued detention of an alien after the 90-day removal
period expires is permissible only for a period that is
"reasonably necessary to secure removal."  Zadvydas, 533 U.S. at
699; see also id. at 682, 701 (finding detention for up to six
months after removal presumptively reasonable).  There,
petitioners were in custody after the expiration of the removal
period and, because there was reason to believe that their
countries would not allow them re-entry, their detention was
potentially permanent.  The Court concluded that "once removal
is no longer reasonably foreseeable, continued detention is no
longer authorized by statute."  Id.  In so doing, the Court
found that "where detention's goal is no longer practically
attainable, detention no longer 'bear[s] [a] reasonable relation
to the purpose for which the individual [was] committed.'"  Id.
at 690 (alteration in original) (quoting Jackson v. Indiana, 406
U.S, 715, 738 (1972)).

26

As a threshold matter, Petitioner's interpretation of
Zadvydas is misguided.  (See Pet Br. at 8-9 (characterizing
Zadvydas as "[f]ind[ing] that government detention violates the
Due Process Clause except in narrow circumstances where a
special justification outweighs the individual's liberty
interest").)  In Zadvydas, the Supreme Court emphasized that
there must be "special justification . . . for indefinite civil
detention."  Zadvydas, 533 U.S. at 690.  Here, Petitioner does
not face indefinite detention, but rather his moving papers
indicate that his detention is expected to last another four to
six months, or perhaps longer.  (See Kling Aff. ¶ 9.)  Moreover,
in Zadvydas, the petitioners challenged their detention
following their removal proceedings.  See Zadvydas, 533 U.S. at
682.  Here, Petitioner challenges his detention based upon the
amount of time that passed between his release from criminal
custody and when he was detained by immigration.  Accordingly,
Zadvydas is entirely inapposite.

In arguing that he is entitled to a bond hearing,
Petitioner contends that he "is no longer a danger to the
community" and "has no incentive to flee."  (Pet. Reply at 8.)
Yet this is exactly the type of discretionary decision-making
that Congress sought to eliminate in enacting Section 1226(c),
which the Supreme Court found constitutional in Demore.  See
Demore, 538 U.S. at 528 ("[I]n adopting § 1226(c), Congress had

27

before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully."). "If an individualized hearing were necessary in [Petitioner's] case, it would presumably also be necessary any time an alien could point to some aspect of his or her life that makes flight particularly unlikely." Young, 2015 WL 1402311, at *7.  That Petitioner may not be a flight risk or a danger to the community is irrelevant.  In enacting Section 1226(c), Congress "chose to accomplish [its] goal by prohibiting DHS's consideration of individualized determinations such as ties to the community in deciding whether to detain certain kinds of aliens." Id. at *5.  Moreover, the Supreme Court has already ruled on the constitutionality of mandatory detention without a bond hearing. See Demore, 538 U.S. at 513.  Petitioner's argument "amounts to nothing more than disagreement with Congress's policy determination and disappointment with the Supreme Court for allowing a categorical imposition of mandatory detention." Romero, 2014 WL 6982937, at *6.  Accordingly, this aspect of Petitioner's due process claim fails.

> 2.   Mandatory Detention of Eleven Months

In Demore, the Supreme Court held that "detention necessarily serves the purpose of preventing deportable criminal

aliens from fleeing prior to or during their removal proceedings
. . . ." Demore, 538 U.S. at 528. The Attorney General's
authority to detain, however, is not unlimited. Indeed, in
Demore "the Supreme Court repeatedly qualified its holding,
noting that mandatory detention is permissible for the
'limited,' 'temporary,' and 'brief period necessary
for . . . removal proceedings . . . .'" Johnson v. Orsino, 942
F. Supp. 2d 396, 408 (S.D.N.Y. 2013) (quoting Demore, 538 U.S.
at 513, 523, 526, 529 n.12, 531, 531 n.13). Although the
Supreme Court did not specify an outer limit as to what
constitutes a permissible detention period, it acknowledged that
"the detention at stake under § 1226(c) lasts roughly a month
and a half in the vast majority of cases . . . and about five
months in the minority of cases in which the alien chooses to
appeal." Demore, 538 U.S. at 530. Nevertheless, the majority
went on to hold that six months did not run afoul of the due
process clause in part because the delayed proceedings were the
result of the alien's own requests. Id. at 530-31.

Though the Second Circuit has yet to address this issue,
many courts in this district have since agreed that a prolonged
detention without an individualized bond hearing may violate the
due process clause. In so doing, many courts have looked to
Justice Kennedy's concurrence in Demore, which clarified that,
"since the Due Process Clause prohibits arbitrary deprivations

of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." Id. at 532 (Kennedy, J., concurring).   Accordingly, the Third, Sixth, and Ninth Circuits, as well as numerous courts in this district, "have interpreted [Section 1226(c)] to contain implicit limitation on unreasonable or unjustified detention." Adler v. U.S. Dep't of Homeland Sec., No. 09 Civ. 4093, 2009 WL 3029328, at *2 (S.D.N.Y. Sept. 22, 2009); see also Johnson, 942 F. Supp. 2d at 408 (citing cases).   This Court agrees that an unreasonably long detention period may violate the due process clause.

However, most courts have not set out a precise length of detention that necessarily presents constitutional problems but have rather considered the "totality of the circumstances" of each case to determine whether a particular detention is "unreasonable or unjustified." Id. at 412.   Here, Petitioner contends that his prolonged detention of over eleven months violates the Due Process Clause.   Indeed, this period is longer than the amount of time that was found constitutional in Demore (six months) and nearly double the amount of time contemplated by the Supreme Court to occur in "the minority of cases" (five months).   Demore, 538 U.S. at 530.   Yet as conceded by the Petitioner, the Supreme Court's statistics "are now more than

30

ten years old," (Pet. Reply at 10) and indeed, as noted by the
Government, courts have since upheld periods of detention that
are longer in duration than Petitioner's. See, e.g., Johnson,
942 F. Supp. 2d at 408-11 (fifteen months); Adler, 2009 WL
3029328, at *2 (fifteen months); Andreenko v. Holder, No. 09
Civ. 8535, 2010 WL 2900363, at *3-4 (S.D.N.Y. Jun. 25, 2010)
(thirteen months).

   As already indicated, however, the length of detention is
not dispositive.  Indeed, courts have found shorter periods of
detention unreasonable.  See, e.g., Araujo-Cortes, 35 F. Supp.
3d at 548 (more than six months); Gordon v. Shanahan, No. 15
Civ. 261, 2015 WL 1176706, at *4 (S.D.N.Y. Mar. 13, 2015) (eight
months).  In other words, "the legal analysis does not simply
turn on the length of detention." Araujo-Cortes, 35 F. Supp. 3d
at 548-49.  As the Third Circuit noted:

> Reasonableness, by its very nature, is a fact-dependent
> inquiry requiring an assessment of all of the
> circumstances of any given case.  That being said, we
> note that the reasonableness of any given detention
> pursuant to § 1226(c) is a function of whether it is
> necessary to fulfill the purpose of the statute, and,
> given that Congress and the Supreme Court believed
> those purposes would be fulfilled in the vast majority
> of cases within a month and a half, and five months at
> a maximum, the constitutional case for continued
> detention without inquiry into its necessity becomes
> more and more suspect as detention continues past those
> thresholds.

Diop v. ICE/Homeland Sec., 656 F.3d 221, 234 (3d Cir. 2011).

In Johnson v. Orsino, Judge Castel summarized the "proper context" for assessing the reasonableness of detention, stating that courts generally consider "factors such as which party bears responsibility for the prolonged detention, whether the continued duration of the detention is finite or near conclusion, and the interests served by continued detention." Johnson, 942 F. Supp. 2d at 409; see also Araujo-Cortes, 35 F. Supp. 3d at 548-89 (adopting this approach); Young, 2015 WL 1402311, at *9 (same); Demore, 538 U.S. at 528, 531 (noting that the respondent himself had requested a continuance of his removal hearings and that, though "the period of detention at issue in Zadvydas was 'indefinite' and 'potentially permanent,' the detention here is of a much shorter duration" (quoting Zadvydas, 533 U.S. at 690-91)).

Under these factors, Petitioner's eleven-month detention does not appear unreasonable. First, there is no evidence in the record that the Government has unreasonably prolonged Petitioner's removal proceedings. See Adler, 2009 WL 3029328, at *2. To the extent the proceedings are extended by appeals or by motion practice initiated by Petitioner, "the Court properly takes into account the fact that [Petitioner's] continued detention" may be at least in part "a result of [his] choice to appeal" and otherwise prolong the proceedings with motion practice. Johnson, 942 F. Supp. 2d at 410. "Although

[Petitioner] indisputably 'has every right to seek any relief from deportation for which he may be eligible, delay caused by his actions does not make continued detention unreasonable or unjustified.'" Id. at 409 (quoting Andreenko, 2010 WL 2900363, at *4).

Second, "there is no indication that [Petitioner's] continued detention . . . will last indefinitely or for a lengthy period of additional time." Id. at 410; see also Young, 2015 WL 1402311, at *10. According to Petitioner's moving papers, his next court appearance before the IJ was scheduled to take place April 21, 2015, and he ultimately expects an appeal to be filed, which may "last[] about 4-6 months" or longer. (Kling Aff. ¶¶ 5, 9.) In other words, although Petitioner anticipates a total detention period that could last up to fifteen to seventeen months, and perhaps longer, he does not face an indefinite detention period. Indeed, the Government contends – and Petitioner does not dispute – that "there is no evidence that there would be an impediment to [Petitioner's] deportation." (Resp. Br. at 17 (citing Luna-Aponte v. Holder, 743 F. Supp. 2d 189, 197 (W.D.N.Y. 2010) (upholding thirty-nine month detention period where, inter alia, there was "absolutely no impediment to Petitioner's eventual deportation" if he lost his appeal)). Along these lines, it is notable that unlike in other cases where detention has been found unreasonable, "the

33

available statistical evidence reveals that DHS removes Jamaican
citizens to Jamaica on a regular basis, indicating that there
are no institutional barriers to petitioner's removal and
repatriation" upon completion of these proceedings. Johnson,
942 F. Supp. 2d at 410 (quoting Williams v. Holder, 2013 WL
1352306, at *5 (W.D.N.Y. Apr. 3, 2013)) (internal quotation
marks omitted); cf. Monestime v. Reilly, 704 F. Supp. 2d 453,
458 (S.D.N.Y. 2010) (granting bond hearing to petitioner who
faced indefinite detention based upon an 18-month moratorium on
all removals to Haiti following the 2010 earthquake); Zadvydas,
533 U.S. at 684-85, 686 (considering evidence that countries
refused to accept removable petitioners, resulting in
potentially indefinite confinement).

Finally, the Government's interests in avoiding flight
justify Petitioner's detention.  Other than vague references to
the complications of his removal proceedings, Petitioner has
offered nothing to suggest that he is not in fact removable
based on his past crimes of moral turpitude.  Though the length
of time since committing these acts may indeed render the danger
to the community justification for detention less compelling,
the likelihood of removal might incentivize flight – especially
when Petitioner and his family have no stable housing in the
area.  (See Wilkins Aff. ¶¶ 7, 13.)  "Therefore, '[t]he primary
justification for detention under [section 1226(c)] – curbing

the risk that a deportable alien will flee - . . . remains
relevant to [Petitioner's] case, and it cannot be said that his
detention is unjustified.'" Johnson, 942 F. Supp. 2d at 411
(alterations in original) (quoting Adler, 2009 WL 3029328, at
*2).

Based on the totality of the circumstances, the Court
concludes that Petitioner's continued detention does not violate
the Due Process Clause.  The Court acknowledges, however, that
this analysis could change if Petitioner's continued detention
extends for reasons beyond his control for a significant
additional period of time.  Accordingly, Petitioner may seek
leave to re-file his petition only with respect to his due
process claim upon a demonstration of changed circumstances
reflecting unreasonable detention.  Petitioner may not, however,
seek leave to reargue any of his claims regarding the
applicability of Section 1226(c) or his claim that the gap
between release from criminal custody and ICE detention violates
due process.

## CONCLUSION

For the reasons stated above and to the extent provided above, Petitioner's petition for a writ of habeas corpus [dkt. no. 2] is DENIED.  Any request for leave to refile the petition on due process grounds shall be made by letter to the Court explaining the relevant changed circumstances.

SO ORDERED.

Dated:     New York, New York
           May *15*, 2015

                                    _____
                                    Loretta A. Preska
                                    Chief United States District Judge